0214, people of the state of Illinois, appellee by Justin Nicolosi v. Lateef Maurice Jackson, appellant by Nathaniel Neiman. Mr. Neiman, did I pronounce that right? Yes, that's correct. Fire him right away. Thank you. Good morning, your honors. May it please the court, counsel. My name is Nate Neiman. I'm an attorney in Rock Island. I'm here on behalf of Mr. Jackson, who is the defendant and post-conviction petitioner in this case. We're asking the court to reverse the trial court's order denying his post-conviction petition and remanding the case for a new trial. Mr. Jackson's single claim on appeal is that trial counsel provided ineffective assistance by failing to conduct an adequate pre-trial investigation. Namely, the central focus of that issue is whether defense counsel was ineffective for failing to contact, interview, and ultimately call at trial a witness named Travis Forgettus. Now, briefly by way of background, there was one witness who was called at trial. His name is Lorenzo Walker, and he was an individual who picked up the defendant from the home where the alleged incident occurred. And he provided brief testimony at trial that there was basically nothing wrong with the defendant. He overheard the defendant speaking on the telephone with the child's mother about possible sickness that the child had and that there was otherwise nothing wrong with him. Sporgettus would have testified as he did at the evidentiary hearing that he was with Mr. Jackson all day long, that he was with Mr. Jackson and the children at the home, and that he left during the evening time, which would have overlapped with when the mother indicated that she got home at 3.30. So in this case, it's kind of like an alibi witness, except sort of a reverse alibi, where instead of the witness saying that this person was not there at the scene of the crime, this person is saying that they were there and that nothing happened. And the... Now, what did the other witness testify to? Are you referring to Mr. Walker? The other two witnesses, the one that was actually called? Yes, there were two witnesses. Are you talking about the one that wasn't called? I'm talking about the one that wasn't called. Yeah, let's talk about the one that was. What did they say? Mr. Walker presented some pretty brief testimony. Basically, he was called to testify that he picked up the defendant from the home during the evening and that he gave him a ride to Davenport across the river and that they were just talking about regular things. Mr. Jackson, the defendant, was talking on the phone with the mother of the child and they were discussing the child's illness, things that had been given him for food, and that kind of thing, that there was basically nothing out of the ordinary. So from a time frame standpoint, that witness would be talking about the time frame during the day or just after... what time frame? During the evening. Essentially, the allegation is that during some time period during the day, and they weren't able to ever pinpoint when that was. Okay, so the theory of the case was that during the day, while the children were in custody of the defendant, something occurred. Correct. Okay, and so this witness that wasn't called would have been allegedly present during the day. That's correct. And what's your argument? Well, essentially, and with respect to Mr. Walker, he wasn't a very effective witness because, number one, by himself. Because, number one, he testified to a time period which is after when the alleged event occurred. And his testimony only makes sense in the context of another witness who would basically be able to corroborate that there was this sort of continuum of calm, essentially, with the defendant from when he was with the child that day to afterwards when he was speaking on the phone to the mother about things that were sort of commonplace that mother and boyfriend, I guess in this case, would talk about with respect to the child. When is this supposed to have happened? Does anybody know? We're not able to pinpoint during the trial when the actual battery, I guess you could say, actually occurred. We know that the mother came home at 3.30, and the trial testimony established that the child was actually sleeping when the mother came home and that she testified that she was sitting there with the defendant in the house and he was just kind of playing video games and not doing anything of note when she came home. And it wasn't until later when the child was awoken from his sleep that the mother discovered the injuries. So I don't believe that they established when this actual injury occurred, but the doctors that testified in the case testified that the injuries to the child were consistent with some sort of battery or beating, for lack of a better word. And sort of the inference that the jury was able to draw from the evidence was, well, you were the only person that was with the child during that time, so therefore if there's evidence of a beating, that you must have done it. When was Mr. Sergetis there? Mr. Sergetis indicated that he was there, I believe that he testified at the evidentiary hearing that he had lunch with them, and then he indicated that he was with the defendant until the evening. Now, that is kind of a difficult time period to pin down as far as what the evening meant, because Mr. Walker picked him up in the evening, and the mother of the child returned home during 3.30, and it's not clear whether that would be sort of considered the evening or not. Let me ask you, were either of these witnesses willing to say that they beat the kid? Not to my knowledge, Your Honor. So who's that beating? Well, if you want to get down into sort of the real deep issues of the underlying trial, there was testimony that the child was actually ill prior to the day in question, and what made the doctors think that there had been some sort of injury was the fact that there was fluid in the child's stomach area, but they could not pin down as to who did it. So there was the defendant that was with the child, but there was also another child that was in the home as well. So that is a possibility. That wasn't the central issue at trial. There was sort of some allusions to it being the child's father, because there was this dispute about the child telling somebody that daddy did it to him, and Mr. Jackson is not his father. So that was sort of part of what the defense strategy was in trying to raise reasonable doubt, was that it wasn't the defendant that actually committed the battery. It could have been the other child that was in the home. It could have been someone entirely different. But that's the inference that the jury drew, was that you were the only one that was with him, even though we're not entirely sure when these injuries occurred. They seem to have occurred recently, and that's the inference that we made. So I think that it's interesting. The state's argument, essentially, is that trial counsel did nothing wrong in that Mr. Jackson did not give him the proper information that he should have given him to prompt him to investigate further. They say in their brief that the fact that the defendant did not mention to Puryear that he was with Spraguetis is crucial to the analysis of Puryear's performance. Now, what I wanted to point out is that Mr. Puryear writes this whole letter, which we admitted in the post-conviction proceeding, and it contains a bunch of witnesses, sort of a short summary of what they would say. A lot of it is completely irrelevant. It's not helpful, but some of it is. And one of the interesting things that Mr. Jackson says about Mr. Spraguetis' testimony that he doesn't say about other witnesses is that Detective O'Brien called him months after being in jail, seeking out information. Now, I think that, if you want to talk about crucial facts, I think that this is one of the most pivotal facts of the whole case, because while Mr. Jackson does not lay out in detail how Mr. Spraguetis could help the case, the fact that it's mentioned that a detective contact him is of significance. And that is because detectives, like defense lawyers, have no interest in talking to character witnesses. They are interested in talking to occurrence witnesses. They are, frankly, interested in talking to witnesses who could gather evidence against the defendant. And so the fact that he notified the defense lawyer that a detective had contacted this person, not that this person had contacted a detective, should have put him on notice that Mr. Spraguetis should have had some valuable information. It could be exonerating. It could be incriminating. But either way, he should know about it. And I think the gist of the state's argument is that it's on the defendant to basically point the defense counsel in the right direction as to where and who to investigate. You don't think any reasonable defendant would tell his lawyer, hey, talk to Fred. I was with him all the time when this was supposed to occur. That's hardly in laying out in great detail. I was with Fred. Go talk to Fred. He can tell you. He was there. I appreciate that argument, but there's one premise that that's based on that is an assumption that defendants are reliable historians of their own cases. And we know from basically our collective experience in the courts that the defendants can be pretty much the most least reliable historians of what happened in their cases. And that is an important thing to know because if, as defense counsel, we would just stop at our client's word as to what happened in the case, as to who was important, who was not, who was there, who wasn't, then we would be severely handicapped in representing that defendant because we would not know the other side of the story. We would not know the whole picture. And that's why it's incumbent on defense counsel to, yes, take some of the information that your client tells you, look into it further. It may lead nowhere. It may lead somewhere. But do your own independent investigation, just like Detective O'Brien. She's trying to find out the facts for herself. There's no reason that a defense lawyer, especially in a case like this, that just has something off about it, that he shouldn't be taking every fact that he can and running with it, every opportunity to investigate the facts of the case and trying to figure out what really did happen here. Mr. Nieman, this is not a public defender who's got a huge caseload and is overburdened. The defendant is paying this lawyer $300 an hour. Is that the regular rate for criminal attorneys in the Moline area? It's a little higher than what I charge, but not much. I mean, it's about standard. I think that that is also important to note because when he testifies, he talks about his staff, too. So this is somebody that has the resources to run this stuff down. In fact, he wasn't even able to recall which associates had been working on the case at the time. And did he do any investigation? It doesn't sound like from his testimony that he did. And that brings me sort of to my last point. There's this sort of amusing comment that the Coleman court states. This is a case that I've mentioned in my brief that sort of tongue-in-cheek, the Coleman court approves of the trial court's characterization of the defendant having been better off with his mother representing him. I say that here not to make light of that, but his mother actually did more pretrial investigation than the lawyer that he paid $30,000 to. And that's not effective assistance counsel. If the defendant and his family are asking you to look into certain things when there's, in a case with so much uncertainty, and you as a law firm have the resources to do so, and you're being paid to do so, and there's the possibility that you're going to either find a witness who's going to corroborate your defense or establish a defense at all, then that's something that is incumbent on trial counsel to do. That was not done in this case by the attorney's own admission. So we would ask this court to reverse the trial court's order denying the post-conviction petition and remand for a new trial. It's basically summarized simply all based on failure to call Sporgettis? I would say that's the central issue. Well, it's the only issue on appeal, isn't it? It is. Okay, so that is the central issue, yes? Yes. So it's based upon failure to call Sporgettis, because Sporgettis could have provided an observation of the children and of the defendant. Is that what you're saying? Not only could he have provided an observation independently, but he also could have been part of a continuum of witnesses who would have been testifying to the same thing, namely that Mr. Jackson, they were with Mr. Jackson at a time period during that day. So I'm talking about Mr. Sporgettis, Mr. Walker, and Ms. Pilcher, who's the child's mother, that from lunch to evening, none of those witnesses saw the defendant batter the child, even the child's mother. And the child's mother came home, correct me if I'm wrong, and the children are asleep at that time? Yes. They're in bed? Yes.  3.30 in the afternoon. 3.30 and the children were already in bed. I believe that I'd have to check the record, but I think that they were napping. I think that's correct. Okay. So it wasn't a situation where they were put down for the night. Well, obviously children were not up running around grieving mother when she came home. Yes. Otherwise she would have allegedly seen this abuse, right? Yes. Because she apparently only was discovering this battery when the children woke up and the paramour was gone, correct? That's my understanding, is that Mr. Jackson had actually left the home at the time in which the mother discovered the injuries to the child. Did he leave the home with Walker? Mr. Walker picked him up from the home to take to the dad and court. Correct. Okay. And so Walker was just talking about, I picked up the defendant and I listened to a cell phone conversation and we went to dad court and he didn't seem upset. He didn't seem upset. And the other fact that he would be able to testify or that he did testify to actually at trial was that he was speaking to Ms. Pilcher about the child's illness and what had been given him for food and that kind of thing. So this wasn't, and this was a fact that came out that the child had some sort of illness. It wasn't, you know, it's not necessarily serious. Well, doesn't it make reasonable inference that the child had been, that there had been an incident during the day that could have led to some battery? That's the inference that the jury drew from the evidence. Right. And they can draw reasonable inferences from facts. Yes. And on direct appeal, you know, in the light most favorable to the state, then that isn't really going to be a very strong argument. Right. But what you're, basically what we're here today for is ineffective assistance counsel for failing to call Spaghetti's. That's correct. In our contention. Because Spaghetti's allegedly could testify to the actions of the defendant in regard to the children and the state of the children during the day. That is correct. And that the complexion of the trial would have been different had he been called to testify. Okay. Thank you. Thank you. Mr. Nicolosi. Good morning, Your Honors. May it please the court, counsel. It seems like most of counsel's argument and discussion with Your Honors dealt with the actual testimony that Spaghetti's may have offered. And I spent the majority of my brief talking about exactly what trial counsel was supposed to have known about this potential witness. So I'll touch briefly on the potential testimony of Spaghetti's. And I think the record is pretty clear based on his affidavit and his testimony at the evidentiary hearing that he didn't have a whole lot to offer. Sure, he was with the defendant most of the day, which is what he testified to. And he didn't say he didn't see a battery. There's not a whole lot of specifics there. Was he sitting next to the defendant every second of the day? Did he see the defendant with the children every second of the day? There's really just not a lot to go on based on Spaghetti's testimony. And counsel's, of course, bootstrapping his entire argument on this testimony of Spaghetti's. And the people just don't see how Spaghetti's really had anything to offer in this case, especially when you consider that he had a couple of felonies and trial counsel. With that being aside, what would your understanding that Spaghetti's would say? That he was with defendant most of the day, had lunch, they played with the kids with defendant, and that was about it. There's nothing else. You don't think that's important? As I acknowledge in my brief, it might provide some support to the defendant if Spaghetti's had been called. But I also think it doesn't carry a whole lot of weight. Again, like I said earlier, there's not a lot of specifics to his testimony here. Was he with defendant every second? Did he have his eyes on the defendant with the kids every second? Did the defendant go into the bedroom to check on the kids while they were sleeping? Was there any cross-examination questions? I don't think so. No, there wasn't a lot of anything that was flushed out here. No, if he had testified. Oh, sure, of course. Yes. Yes, yes, yes. I thought you were talking about his testimony at the M&H hearing. Right. Yes. But again, and I want to focus just like I did in my brief, this is an issue about ineffective assistance of counsel and whether or not there was a substantial showing of that in the PC. And as I stressed in my brief and I highlighted here in my notes, how was this attorney supposed to know that this witness was important? Talk to him. How was he supposed to call everybody? There were 44 names on this list. And the defendant created. He paid $300 an hour and he has staff. But how many is he supposed to talk to? Again, the defendant created this list and the defendant talked to the attorney before he hired him. As Justice Schmidt said, pointed out perfectly, why on earth would the defendant tell his attorney, hey, I was with this guy. He was only with one guy all day. And Walker, we don't even need to talk about Walker. That's after the fact. That's no information, whatever. Why wouldn't you tell your attorney when you talk to him, hey, I was with Travis Bergettis, and then you had that chance, you blew it, then you create a list of witnesses, potential witnesses, and you put a little synopsis of these witnesses. You don't say that you were with this guy? That makes no sense. What is this attorney supposed to do? The attorney is supposed to call people and do an investigation. To what end? It's what he's getting paid to do. Is he supposed to call all 44 people, all of which the defendant provided zero impact that these witnesses would have had? What is this man supposed to do? You sound like it's 4,400 people. It's 44 people. Sure. That's not a whole lot of people. Okay. I want to ask you another question. Did the state establish a time when this happened? No. Did you even establish, not you, did the state even establish that it happened that day? I think of the facts, you really should infer that it happened that day. If he was fine and they had lunch with him and they played with him in the afternoon, assuming at lunchtime, of course, and the mother came home 3.30 when the child woke up sometime later, was injured, obviously I think it stands to reason it happened that day. I don't think there could be any other conclusion, honestly, based on this evidence. I'm sorry. I think there could be another conclusion. Like what? Like it happened the day before. If you didn't establish what day it happened, how do you know this is the day? Why would the mother notice that the child was injured only after he woke up? Because he was complaining. Maybe he didn't complain the day before. I understand that, Your Honor, but this isn't an issue of sufficiency of the evidence. This was tried and that wasn't appealed. Maybe it was appealed. I don't remember one time around. It's a question of prejudice. It's not sufficiency of the evidence. It's whether or not this defendant was prejudiced by the ineffectiveness of his counsel. Sure. I understand, Your Honor. I think the record is pretty strong that the counsel wasn't ineffective. Again, if the defendant had two opportunities to tell him that he was with him and he didn't say anything, and as counsel said, what counsel was supposed to do was see that a detective talked to this person and then supposed to take that indirect hint that maybe there's something important here when the defendant had two chances to give a direct hint that this person was important. It just seems like that counsel is kind of fighting an uphill battle with his defendant in this case here. I'm sorry. I don't want to beat a dead horse, but if you were paying a lawyer $300 an hour, would you expect him to do some investigation? I would expect him to do some investigation, absolutely. Did this lawyer do any investigation? Well, we did a lot of pretrial work as he testified. The question is, did he do any investigation? It doesn't seem like he did a whole heck of a lot. But if I was also paying an attorney $300 an hour, I would have told him who I was with the day I was accused of committing a crime. Assuming that you understood the significance of that. Well, I think the defendant kind of understood the significance. He created a list with all these witnesses. He obviously was thinking about this quite thoroughly if he created this list and talked to his attorney before he even was arrested in this case. I think he knew what was going on. Why he omitted somebody who was supposedly kind of important, I don't think it's debatable how important this witness really was. Does this forget us on the list? Yes. In theory, lawyers are supposed to know more than their clients. It's why they get lawyers. It's why they pay them $300 an hour. I think they're supposed to know more about the law and about strategy. Once they obtain the facts, then they're supposed to be able to, they should be more prepared than the defendant to present that to the trier of fact. But you have to start somewhere. I think most attorneys start talking to their client. I've never had a client, but I would assume that's the way it starts. And this defendant didn't give his attorney a whole lot of information to go on. Let's look at that list just a moment. I mean, you said there was a synopsis of something about each one of them. Not every one, but about some of them, like Spaghettis, there was a synopsis. What would that synopsis be? I don't remember specifically. I think it was about the detective had talked to him, and something about Spaghettis had seen the defendant with the kids before. So basically character stuff, like he'd seen them before and nothing had happened. The inference was on that synopsis by the attorney here, that that would have been character. Sure, it wasn't relevant to what happened on that day. Was Spaghettis there when the mother came home? I don't believe that was established conclusively, but I think we can probably lend that conclusion because he said he was there until the early evening and the mother came home at 3.30. So I think we can draw that conclusion, but again, that wasn't conclusively established. If there are any other questions, I'd be happy to answer them. People would request that this court affirm the judge's decision below. Thank you. Thank you, Mr. O.C. Mr. Neiman, is there a vote? Mr. Purner stated at the evidentiary hearing, if I recall correctly, he didn't have anything directly relevant to the alleged injury in the right time frame, and that was he referring to Mr. Spaghettis. Now, in response to Justice Holdridge's question about what that synopsis said, the state has summarized it in relevant part. On page 9 of their brief where they say, Travis Spaghettis can testify how Detective O'Brien called him months after me being in jail seeking out information, has been over to the alleged victim's mother's house with me, and has seen me or around her kids. That's enough to put him on notice that this witness could have some potential information. That was enough to put Detective O'Brien on notice that this gentleman should have some information. And what's interesting, if you look at that, is that Detective O'Brien on notice. What do you mean by that? Well, I think that I was explaining before that. We have a synopsis here which was given to the defense attorney, correct? That's correct. You just told me what that was, right? Yes. And it was basically that he had been interviewed by the detective and that he had been over at the victim's house, right? Correct. And what else? That he has seen me around the kids. Right. So that's... So what's this detective on notice thing? Well, if you think about this statement. He says that O'Brien called Sporgettis when he was in jail. So there's significance to that. Number one, O'Brien called Sporgettis and not the other way around. Number two, Mr. Jackson did not contact O'Brien and tell her to call Sporgettis. So she had to have known from some other source that Sporgettis had some information about the event that may be useful to her investigation. And that's what I mean by O'Brien being on notice is that somebody had indicated to her, and it wasn't Sporgettis and it wasn't Jackson. Sorry, yes, it wasn't Sporgettis and it wasn't Jackson, that Sporgettis had some information about this incident and that she needed to contact him. She being? Detective O'Brien. Right. And she did, in fact, contact him, but he was actually never interviewed because when... So who brought up Sporgettis to the detective? I'm not sure. I'm not entirely sure. Detective O'Brien did not... Could have been the mother of the children being interviewed. It could have been the mother of the children. More than likely, possibly, which would have put Sporgettis in the presence of her, perhaps, at the time she came home. If Sporgettis is telling the truth in his testimony, and we'll assume for the purposes here that he is, then he would have been the only one besides Mr. Jackson that was at the home with the children and with the mother. So it would make sense that the mother who was talking to the police would say, well, there was this one other guy, he was here all day today, and that's somebody that you should talk to. Ultimately, she didn't end up getting to do that because he was on vacation and was like, hey, I'll call you back later. There's too many she's. You're talking about the detective? I am. Detective O'Brien. Yeah. So he never got to tell his side of the story to anybody, which underscores the importance of... Well, let's go... I'd like to switch gears for just a second because we're not talking about this other prong of the Ineffective Assistance Council, and that is prejudice. And isn't the standard there's reasonable probability that the result would have been different, but fair to call this out? That would be the legal standard, yes. So you've got the kid testifying that he hit me in the stomach. This wasn't an hour-long meeting, apparently, where they're getting punched him in the stomach. And so you've got prejudice who says he's a friend, he's like a brother to me, but not a friend. And he's a convicted felon. And do you really think there's a reasonable probability that prejudice is testimony, because we know it now, would have led to a different result if it had tried? Well, it's always difficult to divine what a theoretical jury would do. I understand. And the Supreme Court's better at it. We've got to do the best we can. I understand. But he could have been placed, like I said earlier, in a continuum of witnesses who would have been able to testify that basically nothing happened that day. And a jury could have accepted that defense, and they could have acquitted the defendant. Now, of course, we don't know for sure whether they would or not, but that's certainly a much more robust defense than the one that the defendant put on. And if the defendant essentially puts on no defense, and you're looking at it retrospectively as to whether this witness is going to change something, then that witness testifying, who is basically sort of a reverse alibi witness, that's going to change the complexity of the case, regardless of whether he's close to the defendant. If he spends the whole day with the defendant and these children, I don't think the jury's going to be suspect of his testimony that he's close to the defendant. And the fact that he's a felon is something that isn't necessarily going to have any bearing on his testimony as to whether he was with him that day. He might have come in. Wasn't his most recent felony 10 years earlier? That's correct. And another point is that I'm not sure how Currier knew that he had a felony if he had never contacted him. And he doesn't explain that during his testimony in the evidentiary hearing. And I'm not so sure, like Your Honor is saying, that that would have been something that the state would have even been used to impeach him, or even if it would have been effective. I mean, if he's testifying, I was with the defendant that day, what kind of impact is it going to have on the jury for a state's attorney to say, well, weren't you convicted of robbery 10 years ago? So what? Well, what instruction does the jury get? Assuming it comes in, what instruction does the jury get about that? Well, the jury's – the instruction that the jury would get would be that they would be able to consider a number of things to evaluate a witness's credibility. And one of them would be a felony conviction. And it would. So anyway, going back to my question, we've heard Spurgettis' testimony at the evidentiary hearing, and we know about the other evidence at trial, including the victim's testimony. Do you think that Spurgettis' testimony creates a reasonable probability that the results would have been different? That's our position. And why, again? Our position is that it would have changed the results on retrial because it would have established a continuum of witnesses who would have testified that they were with the defendant at least until lunch into the evening, and that none of those people saw the defendant injure the child. At least until lunch? Well – Where are we going with that? I think that Mr. Spurgettis comes into the story, he says that he had lunch with Mr. Jackson and the children. So there isn't a whole lot of detail as to when he arrived at the home and how he came into the picture, but presumably if he had lunch with the children and he didn't notice that there was anything wrong with them, a jury would have been able to infer that nothing had happened to the children up to that point. Prior to that point. Right. So it's basically an alibi, but it's not somebody saying that the defendant wasn't at the place where the crime occurred. It's three people saying that the defendant was at the place where the crime occurred and that they didn't see the defendant doing the crime and they didn't see him acting any differently. And I think that that has the same power as an alibi because it establishes that a defendant is there, but that he didn't commit the crime, which is just the same as establishing that the defendant wasn't there and didn't commit the crime. The only difference is the location. So we know that our witnesses, in all cases, don't come to us in perfect form and that they come to us with warts and all and it's up to the jury to believe whether they're credible or not. Okay, the defense attorney testified he did or did not talk to the Sporgettis. He did not talk to Mr. Sporgettis. And you're pointing out that he did testify that he knew Sporgettis had a felony record. He said, I believe, and I believe that he said during the evidentiary hearing, that I believe he had a felony. But I'm not entirely sure how he knew that. So at the evidentiary hearing, what kind did Sporgettis believe? What was his testimony like? His testimony was that he left in the evening. That was as specific as he got? Yes. And the court would have to keep in mind that this case was charged, I believe, back in 2013. So the evidentiary hearing happened four years later. So asking him to pinpoint an exact time, I mean, what he could remember from that day was that it was just like any other day. Did Walker pick the defendant up? I don't recall Walker's specific testimony as to when he picked the defendant up. But it was sometime in the evening. Well, all this evening stuff, don't we have testimony of the victim's mother that she returned to the home at 3.15? I believe it was 3.30, Your Honor. Okay. I don't call that evening. I wouldn't either. And I think that we can infer from the evidence that if Detective, kind of like we were discussing earlier, Detective O'Brien contacted Sporgettis, then she probably got her name from the mother. Well, what I don't understand is if you're putting this witness on at a post-conviction evidentiary hearing, why wouldn't they have him testify whether, yes, I was there when Mother came home or no, I wasn't, instead of saying, no, it was 6 o'clock or 5 o'clock or 4 o'clock. Well, were you there when Mother got home? I mean, in other words, the point of this evidentiary hearing is to try to show that a different result would have been done, but just not, well, we've got all these loose ends because the testimony is so vague and it's the defendant who carries the burden at this stage. I acknowledge that. I mean, what we know is the children were apparently in bed when Mother arrived at 3.30. Correct. And so, obviously, whatever battery occurred would not have occurred after 3.30. Not likely. Not likely. Mother's there. Children are in bed. It's not likely, but it's possible. So, reasonable inference is that any battery that occurred would have occurred prior to 3.30 that day. Yes, and I believe that's what the state's theory was, is that the battery occurred prior to that day and then the child lay down. At that time. Yes, and that when the child woke up, that's when the mother discovered the injuries. But what the doctors testified to was just as to whether these injuries were a result of physical trauma, essentially, that they weren't some other sort of physical condition that the child had. So, talking about pinpointing timelines with accuracy is difficult in this case. And that underscores the importance of investigating and developing these facts so that you can have a robust trial record, so that you can have a robust defense. And Mr. Puryear chose not to do that. That was his choice. What are the potential defenses that a criminal lawyer would have to these facts? Well, I think that the reverse alibi, as I call it, would be... I assume you're a criminal defense attorney. I am. So, I mean, the nice thing about this argument is we don't have any case following. Okay, these are the facts. We have a battered child, mother there at 3.30. We have a doctor saying that this is physical trauma. And you have your client present during the day, has been charged with battering the child. Well, I think that... What do you look for? These types of cases, when you have a battery to a child, I'm specifically thinking of shaken baby cases, which are very similar. It is... Those are incredibly difficult cases to defend because of that... What was the nature of the physical assault? As to what the allegation was... The doctor testified. What did the doctor say? Physical assault. A punch? Yes. So we don't have shaken baby. And in a shaken baby case, the baby can't say he did it, right? That's correct. Now, I left out that important fact. Thank you. Well, I'm going to acknowledge these are difficult cases to defend. I mean, when the jury is sitting there with an injured child or a dead child, and there was somebody that was taking care of the child, the inference almost every time is going to be that that person who... It's called the caretaker, yes. ...was taking care of the child was the one responsible for the child's injury or death. So now that is my point. What is how you defend against all these facts? What do you look for? Because you're trying to say this attorney was ineffective. Well, I think that the best thing that you can do to establish a defense in this case would be as just... Well, we're not established, present. Present. Because you're saying ineffective for not presenting. I think the best thing that defense counsel could have done in this case is to argue, since there wasn't any evidence that it occurred that day, that it could have occurred prior to that. And that's where these witnesses come into play as far as their importance is that... But if it occurred prior to that, how does that change the victim's testimony that he did it? It makes him impeachable. On what? You could say he'd be impeachable by saying that he did it. You're saying if it didn't happen then, it happened earlier. And, okay, the defendant did it earlier and not later. Well, the difference would be that if it happened earlier, then the defendant wouldn't be the only one with the child. And, you know, it could have been much more probable that it was the mother. It could have been more probable that it was the sister. It could have been probable that it was the child's father. Any number of these arguments are much more available to defense counsel, if that's the strategy, than when he's the sole caretaker of the child, which isn't really even the case. I mean, we know from Sprogettis' testimony that Mr. Jackson wasn't the sole person in the house. He might have been the one that was responsible for the child's well-being. Is there any evidence in the record how long the caretaker was caring for the child without the presence of the mother? I believe the evidence in the record indicated that the mother left for work in the morning and that Mr. Jackson began caring for the child when the mother left work. And I'd have to double-check the record, but I think that he actually came over to the house. He did not live there. And I remember from the record that he occasionally spent the night there. But I think that she had called him and said, hey, I'm going to work. Come over and watch the kids. And so that's what he did. So there would be- Did the mother testify? She did. That's Ms. Pilcher. Yes, you're right. And she testified the child was fine when she left. I don't- I do recall that there was testimony about the child being sick, but she did not testify, for instance, that the child had injuries on him prior to her leaving. So there was no testimony as to that. And her testimony, frankly, wasn't that- wasn't really that impactful in the grand scheme of things because she just testified that she discovered the injury, went to her neighbor, they called the cops, and that was kind of the extent of her testimony. So her testimony was important in establishing who discovered the injury and when and what was done afterwards as to sort of the chain of custody of the child through the medical care system. But overall, she wasn't able to really shed much light on the offense conduct because she was at work. Mr. Newman, there was something in one of the briefs about the mother, the defendant's mother, asking Mr. Puryear to do some investigation that apparently, according to her, the child's mother had had some DCFS reports. That's correct. Was that ever followed up on? No, it was not. But the suggestion was that there had been reports indicating that the mother had been abusive before? There were, and that was in the record. And I didn't want to- Justice Smith, when you were talking about that, I didn't want to bring in extra record evidence into this conversation because those DCFS reports didn't come in either at trial or during the evidentiary hearing. Was the allegation made that the lawyer was given that information during the evidentiary hearing? Yes. But he did not look into that. So that was among the things that the mother gave to- Now, some of the things that the mother gave to defense counsel would have been worthless, like his military records. They could have come into play during sentencing as something that would be useful to that, but she gave him some information that he could have run with. Were you post-conviction counsel? I was. And you had these DCFS records? I did not have- You knew what was in them? I did not have the records themselves, but I knew what the general- But there was a reason you didn't offer them. Well, I did not. I chose not to. But they wouldn't have helped your client's case? Essentially. Thank you very much. Thank you. Thank you both for your arguments here today. That will be taken under advisement. This position will be issued. Right now we'll be-